# CASE NO. 24-1158

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

LYNNE KRITTER, AS EXECUTOR OF THE ESTATE OF EUGENE JOHN
KRITTER, III; AND KRITTER CROPDUSTING, INC.

v.

BRENT MOORING, AS ADMINISTRATOR CTA OF THE ESTATE OF
MURRY DAW; DAW FARMS, INC.; NUTRIEN AG SOLUTIONS, INC.; AND
WILLIAM JORDAN ELMORE

---

ON APPEAL FROM
THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF
NORTH CAROLINA

---

# OPENING BRIEF OF APPELLANTS LYNNE KRITTER
# AND KRITTER CROPDUSTING, INC.

---

SUBMITTED BY:

W. Thompson Comerford, Jr.
John A. Chilson
COMERFORD CHILSON
& MOSER LLP
1076 West 4th Street
Winston-Salem, NC 27101
Telephone: (336) 631-8510
Facsimile: (336) 631-8228
comerfordt@ccm-law.com
chilsonj@ccm-law.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                              YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                              YES      NO
        If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                                    YES    NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)        YES    NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                                   YES    NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?                  YES    NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: _____

Counsel for: _____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?      YES    NO


2.    Does party/amicus have any parent corporations?                          YES    NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        YES    NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES    NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)        YES    NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    YES    NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?        YES    NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF ISSUES .................................................................1

STATEMENT OF CASE .....................................................................2

SUMMARY OF ARGUMENT ...........................................................13

ARGUMENT ....................................................................................13

CONCLUSION ................................................................................40

STATEMENT REGARDING ORAL ARGUMENT ...................................40

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986)............. 14

*Asher v. Honeycutt,* 284 N.C. App. 583, 876 S.E.2d 660 (2022) ............. 14

*Baine v. Oklahoma v. Gas & Elec. Co.*, 1992 OK CIV APP 140, 850 P.2d
346 (Ok. Ct. App. 1992) ........................................................................ 27

*Bogle v. Duke Power Co.*, 27 N.C. App. 318, 219 S.E.2d 308 (1975) 29, 31

*Branzel v. City of Concord*, 247 Cal. App.2d 68, 55 Cal. Rptr. 167 (1966)
.................................................................................................................. 30

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986).............. 14

*Cowan v. Laughridge Const. Co.*, 57 N.C. App. 321, 291 S.E.2d 287 (1982)
.................................................................................................................. 37

*Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156  (4th Cir. 1988) ................. 21

*Davidson & Jones, Inc. v. New Hanover Cnty.*, 41 N.C. App. 661, 255
S.E.2d 580 (1979) .................................................................... 32, 33, 36

*Diggs v. Novant Health, Inc.*, 177 N.C. App. 290, 628 S.E.2d 851 (2006)
.................................................................................................................. 21

*Emmons v. City of Chesapeake*, 982 F.3d 245 (4th Cir. 2020)............... 30

*English v. Clarke*, 90 F.4th 636, 645 (4th Cir. 2024) ............................... 13

*Estate of Long v. Fowler*, 378 N.C. 138, 861 S.E.2d 686 (2021) ............. 33

*Firemen's Mut. Ins. Co. v. High Point Sprinkler Co.*, 266 N.C. 134, 146 S.E.2d 53 (1979) .................................................................................... 36

*Florida Power and Light Co. v. Lively*, 10 Fla. L. Weekly 589, 465 So. 2d 1271 (Fla. Dist. Ct. App. 1985) ........................................................... 28

*Foster v. Winston-Salem Joint Venture,* 303 N.C. 636, 281 S.E.2d 36 (1981) ................................................................................................... 29

*Fussell v. North Carolina Farm Bureau Mut. Ins. Co., Inc.*, 364 N.C. 222, 695 S.E.2d 437 (2010) ........................................................................ 32

*Gunn v. Edison Sault Elec. Co.*, 24 Mich. App. 43, 179 N.W.2d 690 (Mich. Ct. App. 1970) .................................................................................... 28

*Hildenbrand v. McDowell Furniture Co.*, 212 N.C. 100, 193 S.E.2d 294 (1937) ................................................................................................... 39

*Hobby Shop, Inc. v. Drudy*, 161 Ind. App. 699 (1974) ............................ 29

*Holcomb v. Colonial Assocs.*, L.L.C., 358 N.C. 501, 597 S.E.2d 710 (2004) ................................................................................................................ 15

*Inferrera v. Town of Sudbury*, 31 Mass. App. Ct. 96, 575 N.E.2d 82 (1991) ................................................................................................................ 31

*Jones v. Douglas Aircraft Co.*, 251 N.C. 832, 112 S.E.2d 257 (1960) ..... 35

*Lambeth v. Media Gen., Inc.* 167 N.C. App. 350, 605 S.E.2d 165 (2004) ...................................................................................... 36, 37

*Lampkin ex rel. Lampkin v. Hous. Mgmt. Res., Inc.*, 220 N.C. App. 457, 725 S.E.2d 432 (2012) ......................................................................... 15

*Langley v. R.J. Reynolds Tobacco Co.*, 92 N.C. App. 327, 374 S.E.2d 443 (1988) .................................................................................. 37, 38

*Martishius v. Carolco Studios, Inc.*, 142 N.C. App. 216, 542 S.E.2d 303 (2001), aff'd, 355 N.C. 465, 562 S.E.2d 887 (2002) .................. 20, 25, 26

*McConnell v. Pic-Walsh Freight Co.*, 432 S.W.2d 292 (Mo. 1968)..........35

*McCorkle v. N. Point Chrysler Jeep, Inc.*, 208 N.C. App. 711, 703 S.E.2d 750 (2010) ..................................................................... 14, 20

*Medley v. N. Carolina Dep't of Correction,* 330 N.C. 837, 412 S.E.2d 654 (1992) .................................................................................. 21, 22

*Nelson v. Freeland*, 349 N.C. 615, 507 S.E.2d 882 (1998) .... 15, 19, 20, 40

*Overton v. Farmers Mfg. Co.*, 196 N.C. 670, 146 S.E. 706 (1929) ..........35

*Palsgraf v. Long Island R.R. Co.,* 238 N.Y. 339, 162 N.E. 99 (1928) .....32

*Perry v. Am. Bakeries Co.*, 262 N.C. 272, 136 S.E.2d 643 (1964) ...........39

*Pike v. D.A. Fiore Const. Services, Inc.*, 201 N.C. App. 406, 689 S.E.2d 535 (2009) ....................................................................................38

iv

*Pinnix v. Toomey*, 242 N.C. 358, 87 S.E.2d 893 (1955) ..........................31

*Poelstra v. Basin Elec. Power Co-op.*, 1996 S.D. 36, 545 N.W.2d 823 (S.D. S. Ct. 1996) ........................................................................................27

*Quail Hollow East Condo Ass'n v. Donald J. Scholz Co.,* 47 N.C. App. 518, 268 S.E.2d 12 (1980)......................................................................32, 33

*Roumillat v. Simplistic Enterprises, Inc.,* 331 N.C. 57, 414 S.E.2d 339 (1992) ................................................................................. 15, 16, 39

*Shepard v. Catawba Coll.* 270 N.C App. 53, 838 S.E.2d 478 (2020) ......20

*Shute v. Moon Lake Elec. Ass'n, Inc.,* 899 F.2d 999 (10th Cir. 1990).....30

*Slaughter v. Slaughter*, 264 N.C. 732, 142 S.E.2d 683 (1985) ..............32

*Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 626 S.E.2d 263 (2006) ...............................................................................................................32

*Towe v. Sacagawea, Inc.*, 357 Or. 74, 347 P.3d 766 (Or. 2011) .............31

*Walker v. Texas Elec. Service*, 499 S.W.2d 20 (Tex. Civ. App. 1973) .....28

*Waller v. Hipp*, 208 N.C. 117, 179 S.E.2d 428 (1935)............................38

*Wellmon v. Hickory Const. Co.*, 88 N.C. App. 76,362 S.E.2d 591 (1987)37

**Statutes**

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1332(a)..................................................................................1

**Rules**

Fed. R. Civ. P. 56(a)......................................................................14

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because it arises from the January 17, 2024 final judgment and order of the U.S. District Court for the Eastern District of North Carolina granting Defendants-Appellees' motions for summary judgment and denying Plaintiffs-Appellants' motion for partial summary judgment. (J.A. 002566-002596). On February 14, 2024 and February 16, 2024, Plaintiffs-Appellants filed timely notices of appeal. (J.A. 002597-002598).

## STATEMENT OF ISSUES

1.     Did the District Court err by granting the motions for summary judgment of Daw Farms, Inc., and the Estate of Murry Daw on the basis that the risk of a three-sixteenth-inch cable, erected over an agricultural field at the same height that an agricultural aircraft operator would be expected to fly over the field, was unforeseeable as a matter of law.

2.     Did the District Court err by granting the motions for summary judgment of William Jordan Elmore and Nutrien Ag Solutions, Inc., on the sole basis that these defendants, although they arranged and coordinated the entire aerial spraying operation, had no duty of care to the pilot they hired.

3.     Did the District Court err by denying Lynne Kritter and Kritter Cropdusting, Inc.'s motion for partial summary judgment by ruling that a landowner (Murry Daw), his lessee (Daw Farms, Inc.), and their actual or apparent agent who organized the spraying operation (Elmore), owed no duties of reasonable care to a lawful visitor invited on the property.

## STATEMENT OF CASE

A few weeks prior to June 18, 2020, Jordan Elmore, a crop consultant and salesman employed by Nutrien Ag Solutions, Inc., contacted Gene Kritter, the chief pilot and owner of Kritter Cropdusting, Inc. (J.A. 71, J.A. 73-74). Elmore hired Kritter to apply chemicals by helicopter to control stinkbugs which had infested corn crops cultivated by Daw Farms, Inc., and Elmore's own crop of about 180 acres. (J.A. 73-74, J.A. 86, J.A. 1178, J.A. 1194). The aerial application operation was

scheduled for June 18, 2020. (J.A. 71). A total of 900 - 1000 acres of corn were to be treated with chemicals sold by Elmore's employer, Nutrien. (J.A. 74-75, J.A. 1184). Among the fields to be treated with chemicals was an 18-acre field leased by Murry Daw to Daw Farms. (J.A. 907, J.A. 1687, J.A. 2379).

Kritter, a highly experienced agricultural pilot with over 19,000 hours of flight time, arrived at Jordan Elmore's farm around noon on June 18 from his base in Culpeper, VA, for a prearranged meeting at Elmore's farm. (J.A. 681-684, J.A. 838, J.A. 1191-1194, J.A. 2393). There, Elmore showed Kritter on a digital map the location of the fields to be sprayed with chemicals. (J.A. 1192-1194). Following this meeting, Elmore observed Kritter begin the spraying operation, starting with Elmore's crops. (J.A. 1196-1198, J.A. 1209).

After spraying Elmore's land, Kritter moved on to Daw Farms' fields, per Elmore's direction, where his Robinson R66 helicopter struck a three-sixteenth-inch steel cable extended over the corn field leased by Murry Daw to Daw Farms. (J.A. 1229-1233, J.A. 1377-1378, J.A. 2333-2334, J.A. 2392). The cable, virtually invisible to the naked eye, had been rigged by Murry Daw from a single pole near the center of the cornfield,

3

on which a deer stand was erected near the border of properties owned by brothers Delanor and Murry Daw. (J.A. 922-927, J.A. 948, J.A. 2339-2340, J.A. 2397, J.A. 2533). It ran to a tree in the woods on the east side of the field. (J.A. 922-927, J.A. 948, J.A. 2339-2340).

Murry Daw, the officers of Daw Farms, including Paul and Delanor Daw, and Jordan Elmore all knew about the steel cable and knew or should have known it presented a deadly hazard to a cropduster flying at the same level as the cable. (J.A. 926, J.A. 975-977, J.A. 1022-1023, J.A. 1139-1140, J.A. 1160-1161, J.A. 1682, J.A. 1687-1688, J.A. 1199-1200, J.A. 1209-1210, J.A. 2386-2387). With this knowledge, all of the Defendants chose *not to* inspect the field for hazards, *not to* remove the cable, *not to* mark it so that it was visible, and *not to* warn Kritter, who had never visited this farm. (J.A. 88, J.A. 1039, J.A. 1196, J.A. 2396).

Despite these facts, the District Court granted summary judgment in favor of all Defendants – landowner (Murry Daw), his corporate farm lessee (Daw Farms, Inc.), their agent and representative who organized the cropdusting operation (Jordan Elmore) and his employer (Nutrien Ag Solutions, Inc.). (J.A. 2584). The Court determined that none of these defendants were responsible for keeping the land safe for lawful visitors,

and that none owed a duty to remove the hazardous cable or warn about it. (J.A. 2554-2583).

### a. Each Defendant Was Familiar with Cropdusting Operations and Knew About the Cable.

The cable, placed by Murry Daw about twenty years before the June 18, 2020 crash, spanned 294 feet across the corn field, drooping from 32 to 16 feet above the ground. (J.A. 90, J.A. 1029, J.A. 1377-1378, J.A. 2308, J.A. 2392, J.A. 2533). It was bolted to a tree in the woods on the east side of the field. (J.A. 2308). The cable, used only to attract doves, had been abandoned for several years. (J.A. 927-928).

Murry Daw farmed the 18-acre field from 2005 until 2012 and leased it to other farmers thereafter. (J.A. 2386-2387). He was a lifelong farmer, was very familiar with cropdusting and frequently hired cropdusters to apply chemicals to his fields. (J.A. 1161, J.A. 1681, J.A. 1687).

Murry Daw leased this field to Daw Farms, Inc., in 2016, but maintained control over it. (J.A. 2387). According to his nephew, Paul Daw, Murry Daw was "very particular about his hunting land and fields," and kept a key to access the property. (J.A. 940-941, J.A. 1029).

Daw Farms, Inc., is a commercial farm run by Murry Daw's brother, Delanor Daw, and nephew, Paul Daw. (J.A. 964-965). All of its farming operations were on leased property. (J.A. 969). Daw Farms grew corn on the field in 2019 and again in 2020. (J.A. 907, J.A. 972, J.A. 1135, J.A. 2387). Like Murry Daw, the officers of Daw Farms were aware that the cable extended across the field. Paul Daw, the Vice President and manager of Daw Farms, had known of the cable's presence for a "long time before 2020." (J.A. 1023). Delanor Daw, President of Daw Farms, owned the field that immediately bordered his brother's field. (J.A. 2533). He described the cable as both "suspicious" and "unusual" and had never seen a non-energized cable run from a tree across a farmed field to an isolated pole like the one in Murry Daw's field. (J.A. 923-925).

Operators of a multi-thousand-acre commercial farm, Daw Farms' officers and managers were long familiar with cropdusting. (J.A. 859, J.A. 967-968). They frequently hired aerial applicators and had often observed their low-flying altitude. (J.A. 884-886, J.A. 975-976). Delanor Daw knew that aerial applicators fly "pretty low," and that Gene Kritter would fly similarly over Daw Farms' fields – including the field with the steel cable.

6

(J.A. 900-901, J.A. 907). He had personally "seen an airplane [fly so low] that [it] had beans on [its] wheels" while spraying crops. (J.A. 900).

Like his nephew Paul Daw, Delanor Daw observed a helicopter spray their corn fields in 2019. (J.A. 900, J.A. 977, J.A. 982). Asked if he could recall how far above the top of the corn the helicopter was flying in 2019, Delanor Daw stated "No, I can't - - *it looked mighty close. That's all I know.*" (J.A. 900) (emphasis added). This aerial application, also arranged by Jordan Elmore, nearly ended in disaster when the pilot, Richard Wheeler, barely avoided the same steel cable which took Gene Kritter's life. (J.A. 1143-1144, J.A. 2240-2243). Tragically, this near miss was not reported. (J.A. 2250-2252).

Jordan Elmore, a farmer as well as a crop consultant and chemical salesman for Nutrien, frequently visited local farmers' fields to sell chemicals to protect crops. (J.A. 71, J.A. 72, J.A. 1113, J.A. 1116-1117, J.A. 1126). Daw Farms had been a customer of Elmore and Nutrien (and Nutrien's predecessor Crop Production Services) since 2013. (J.A. 1128-1129). Elmore and Nutrien provided additional services to those who purchased chemicals from them – including hiring and coordinating cropdusters. (J.A. 60-61, J.A. 890-894). Elmore received a salary and

bonus from Nutrien that was based on the success of his Nutrien local branch. (J.A. 1123). Daw Farms alone paid Nutrien an average of $750,000 annually. (J.A. 1064).

In June 2020, just as in 2019, Daw Farms authorized Elmore to act on its behalf to coordinate a spraying operation. (J.A. 980, J.A. 981, J.A. 985-986, J.A. 992). For the June 2020 operation, Elmore sought out and hired Gene Kritter (J.A. 1181-1182). He scheduled Kritter's arrival and identified landing zones for refueling and chemical resupply. (J.A. 1189-1196). Most significantly, he located all of the fields to be sprayed by placing "pins" on a digital map of the farmland. (J.A. 1192-1194). Because Daw Farms' fields spread over several miles, it was necessary for Elmore to locate each separate field for Mr. Kritter. (J.A. 1004-1007). In the words of the Vice President of Daw Farms, "[Elmore] was going to arrange *everything*, to get Kritter out [t]here . . . set it all up." (J.A. 983) (emphasis added).

Elmore had previously observed the cable's location while riding on a combine on Delanor Daw's adjacent field. (J.A. 1141-1142, J.A. 2533). This field adjoined Murry Daw's 18 acres to form a larger cornfield, with the deer stand and pole in its center. (J.A. 2533, J.A. 2392). Immediately

8

prior to Gene's crash, Elmore was near the field where the crash occurred. (J.A. 1226-1229).

Elmore, who had observed cropdusters his "whole life," understood how fixed-wing and helicopter cropdusters operate. (J.A. 1161, J.A. 1199-1200). He knew from past experience and observation that Kritter would fly just above the tops of the corn. (J.A. 1199-1120, J.A. 1161). Moreover, the altitude of the spray operation was apparent to Elmore on the day of the accident when he personally observed Kritter apply chemicals to his fields only fifteen to sixteen feet above the ground. (J.A. 1209-1210).

> **b.  Each Defendant Failed to Remove, Mark, or Warn of the Presence of the Steel Cable, which was a Hidden Danger to a Cropduster.**

The three-sixteenth-inch steel cable was a hidden danger to cropdusters. In 2019, Elmore and Daw Farms hired Richard Wheeler to spray fields which included Murry Daw's field. (J.A. 1150, J.A. 2230-2232). As Wheeler sprayed this field, he flew north to south over the tree line, opposite the direction that Gene Kritter would fly there a year later. (J.A. 2241-2243). As he descended, he nearly flew into the cable. At the last moment, the sun reflected on the cable and Wheeler managed to avoid it. (J.A. 2241). He described this near-miss as "99 [percent] pure luck." (J.A. 2241). Gene Kritter was not so lucky.

The combined acreage of corn on the land farmed by Daw Farms made meaningful scouting of the land to be sprayed from ground level "physically impossible." (J.A. 2580-2581, J.A. 1048). As Paul Daw stated, "[n]o human being can physically [scout 700 acres]." (J.A. 1048). Since Murry Daw, Delanor Daw, Paul Daw, and Jordan Elmore all already knew of the cable's presence, scouting was unnecessary for them. Not told about the cable's presence, Kritter could not be expected to find it from the ground.

Gene Kritter had to depend on observations from his helicopter. According to defense expert Dr. Kenneth Orloff, who is not an agricultural pilot, Kritter satisfied his duty of due diligence by conducting several flyovers of the subject field. (J.A. 1930). Orloff's opinion was confirmed by Plaintiffs' expert, Rod Thomas, the only expert cropduster in this case, who opined that Gene's pre-spray reconnaissance fully complied with industry standards. (J.A. 2375).

It was nearly impossible for Kritter to see the cable during his surveillance flights or while spraying the crop. (J.A. 2338-2343). Plaintiffs' experts, Joe Manning, Ph.D., P.E., and Johnnie Hennings P.E., reconstructed the accident, under similar conditions, using a drone and

10

camera. (J.A. 2334-2335, J.A. 2338-2240). This showed that, given the helicopter's speed, Gene Kritter could not have seen the cable with "enough time to begin maneuvering the craft before he reached the cable's location." (J.A. 2341-2342). This opinion confirmed Wheeler's experience – had he been flying the direction Gene Kritter was flying, he too would have hit the cable. (J.A. 2282-2283).

Elmore had two opportunities to tell Kritter about potential hazards in the field. First, when he met him at his farm, Elmore located for Kritter all of the fields to be sprayed, including Murry Daw's eighteen-acre field. (J.A. 1191-1194). According to Rod Thomas, based on industry practices, he would have expected Elmore to advise Mr. Kritter of hazards, including the cable, at this meeting. (J.A. 2069). Elmore made no mention of the cable when he briefed Kritter. (J.A. 1196-1197, J.A. 1199, J.A. 1264-1265).

About four hours later, at 4:48 PM, after spraying several fields, Kritter called Elmore while on the ground near the accident site to refuel and load more chemicals. (J.A. 2352-2357, J.A. 2400). This call took place only sixteen minutes before the fatal crash. (J.A. 2364, J.A. 2400). Just prior to this call, Gene had noticed the deer stand and commented to

11

Phillip Chambers, one of the ground crew members, that the stand would be a good place to hunt deer. (J.A. 699, J.A. 714). Gene Kritter did not see the cable from the helicopter because no mention was made of it. (J.A. 701). Phillip Chambers overheard Kritter ask Elmore during this call if there was anything he "need[ed] to be aware of on this farm." (J.A. 696). Elmore again failed to warn Kritter about the hazard. (J.A. 1196, J.A. 1264-1265).

### c.     As a Result of The Defendants' Failure to Remove, Mark, or  Warn of the Steel Cable, Gene Kritter Struck the Steel Cable, Crashed, and Died.

Unaware of the cable, Kritter piloted his helicopter on a collision course with the unseen cable. (J.A. 2356). He first flew north-to-south over the field to the west of the pole and cable. (J.A. 2354-2355). When he reached the southern tree line, he made a one-hundred-eighty-degree turn to the north, spraying the portion of the field where the cable was suspended directly in his path. (J.A. 2356). Kritter collided with the steel cable just after 5:04 PM. (J.A. 2364). The cable wrapped around the main rotor and blades of the helicopter, which crashed in the northeast part of the field, where Gene Kritter died. (J.A. 1229-1236).

## SUMMARY OF ARGUMENT

The District Court determined that Kritter's easily preventable death was unforeseeable to the Daw Defendants and that Elmore had no duty to warn about the cable. This was error. The crash was reasonably foreseeable, if not inevitable, and each Defendant breached their duties to keep the premises in a reasonably safe condition and to warn of a dangerous condition that was not open and obvious.

Plaintiffs-Appellants respectfully request that this Court reverse the District Court's order granting Defendants' motions for summary judgment and denying Plaintiffs' motion for partial summary judgment.

## ARGUMENT

### I. Standard of Review

This Court reviews "de novo a district court's decision to grant summary judgment, applying the same legal standards as the district court and viewing the facts and reasonable inferences in the light most favorable to the nonmoving party." *English v. Clarke*, 90 F.4th 636, 645 (4th Cir. 2024) (internal quotation omitted). Summary judgment is only appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S. Ct. 2548, 2556 (1986); Fed. R. Civ. P. 56(a). The court must not "weigh the evidence and determine the truth of the matter but [] determine whether there is a genuine issue for trial." *Anderson v. Liberty, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).

## II. Murry Daw Had a Duty of Reasonable Care to Protect Gene Kritter.

### a. All Landowners Owe a Nondelegable Duty to Exercise Reasonable Care for the Protection of Lawful Visitors on Their Land.

All landowners have a "*nondelegable* duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors." *Asher v. Honeycutt,* 284 N.C. App. 583, 591, 876 S.E.2d 660, 667-68 (2022) (emphasis added) (internal quotation omitted). This duty requires a landowner to make a reasonable inspection of their land to ascertain the existence of all hidden dangers. *See McCorkle v. N. Point Chrysler Jeep, Inc.*, 208 N.C. App. 711, 714, 703 S.E.2d 750, 752 (2010). Accordingly, a landowner "has a duty to (1) exercise reasonable care to keep [their] premises in a reasonably safe condition, and (2) to give warning of hidden perils or unsafe conditions insofar as they can be ascertained by reasonable inspection." *Roumillat v. Simplistic*

*Enterprises, Inc.,* 331 N.C. 57, 64, 414 S.E.2d 339, 342-43 (1992), abrogated on other grounds by *Nelson v. Freeland*, 349 N.C. 615, 631, 507 S.E.2d 882, 892 (1998). To prove a landowner's negligence in a premises liability action, a plaintiff must only "show that the defendant either (1) negligently created the condition causing the injury, or (2) negligently failed to correct the condition after actual or constructive notice of its existence." *Id.* This duty applies to all legal visitors. *See Nelson,* 359 N.C. at 631, 507 S.E.2d at 892 ("[T]his Court concludes that we should eliminate the distinctions between licensees and invitees by requiring a standard of reasonable care toward *all* lawful visitors.") (emphasis added).

When a landowner leases his property to others, but maintains rights of control, the landowner retains his duty of care for unsafe conditions. *See Holcomb v. Colonial Assocs.*, L.L.C., 358 N.C. 501, 508, 597 S.E.2d 710, 715 (2004) ("a landlord owes a duty to third parties for conditions over which he retained control"); *see also Lampkin ex rel. Lampkin v. Hous. Mgmt. Res., Inc.*, 220 N.C. App. 457, 461, 725 S.E.2d 432, 435 (2012).

### b.     Murry Daw Was Required to Protect Lawful Visitors from the Hidden Danger He Created on His Land.

Murry Daw created the dangerous hidden condition on his land that took Gene Kritter's life. As the landowner, he had a duty to exercise reasonable care to keep his premises in a safe condition, to conduct reasonable inspections, and to remove or warn of any hidden perils. *See Roumillat*, 331 N.C. at 64, 414 S.E.2d at 342-43. Instead, even when he stopped using the cable to hunt, Murry Daw allowed the dangerous cable to remain over the field, obscured by a background of trees and crops (J.A. 927, J.A. 1396-1397, J.A. 2059).

Like any landowner in North Carolina, Murry Daw had a duty to protect lawful visitors from the danger he created. *See Roumillat*, 331 N.C. at 64, 414 S.E.2d at 342-43. That duty existed from the time he erected the cable until it was struck by Kritter's helicopter. Murry Daw knew from personal experience that the cable was a trap for cropdusters who would periodically spray this field. And it was, as shown by the near miss in June of 2019 and Kritter's fatal crash in 2020.

Nothing prevented Murry Daw from fulfilling his duties, who despite the lease, maintained control over the field. (J.A. 940-941, J.A. 1029, J.A. 1063). At any point, he could easily have removed the cable,

16

which he should have done, especially when the hazard no longer had any purpose whatsoever. Failing that, he could have attached warning markers to the wire, or made sure that cropdusters or other visitors were warned about its presence. (J.A. 2376). Any of these actions would have prevented Gene Kritter's death.

### c. The District Court Erred by Finding That the Danger a Steel Cable Presented to a Cropdusting Aircraft was Unforeseeable as a Matter of Law.

Evidence of the foreseeable dangers presented to cropduster pilots by the cable extended across the field includes the following:[1]

- Murry Daw was a farmer with over thirty years of experience. (J.A. 85, J.A. 1674-1675).

- Murry Daw personally installed the steel cable over his field twenty years before the crash. (J.A. 494-495, J.A. 1836-1837, J.A. 2005).

- Defense and Plaintiffs' experts agreed that any wire suspended over farmland, including the steel cable in this case, is "certainly" a

---

[1] Murry Rayborn Daw passed away in November 2020, before the Plaintiffs had the opportunity to serve discovery on or depose him. (J.A. 002581). Murry Daw's wife, Margie Daw, was unable to testify in this matter due to poor health. (J.A. 1667). As a result, their son, Garry Mooring, testified on Murry's and Margie's behalf. (J.A. 1667).

17

hazard to an agricultural pilot when the pilot is unaware of the wire's existence. (J.A. 494-495, 1836-1837, J.A. 2005).

- For years, Murry Daw sat for hours on the deer stand affixed to the pole, just under the cable, while hunting. (J.A. 920, J.A. 1023-1024).

- From at least 2005 until 2012, Murry Daw used the field with the cable erected across it to farm crops. (J.A. 2386-2387).

- Because Murry farmed the field, he would have been continually reminded of the cable's presence. (J.A. 1687-1688, J.A. 2386).

- Each time that a combine harvester entered the field, the operators would pass under the cable with as little as two feet of clearance. (J.A. 418-421, J.A. 1687-1688).

- From 2012 to the present, Murry Daw leased the field with the cable for farming. (J.A. 2387).

- Crops, including corn, were annually planted and harvested in the field under the cable. Hence, the cable was passed under at least twice per year. (J.A. 1675-1676, J.A. 1687-1688,).

- Before helicopter pilots were hired in 2019 and 2020, Murry Daw and his son frequently hired fixed-wing aerial applicators to apply

chemicals. (J.A. 1661, J.A. 1663-1664, J.A. 1676-1677, J.A. 1681-1682).

- Aerial cropdusters had been a feature for farming in Wayne County for over twenty years before 2020. (J.A. 884-885, J.A. 975, J.A. 1161).

- Upon hearing that Gene Kritter's helicopter had crashed into a line, Garry Mooring immediately knew that the cable was responsible. (J.A. 1679-1680).

From these facts, a jury can reasonably infer that Murry Daw knew that the farmland over which he had suspended the cable would require the services of cropdusters like Gene Kritter who would fly at low altitude while spraying crops. From these inferences, a jury could find that the danger the cable presented to a cropduster was reasonably foreseeable.

## III.  As An Occupier of Land, Daw Farms Had a Duty of Reasonable Care to Protect Its Lawful Visitor Gene Kritter.

### a.  Occupiers and Lessees of Land Owe a Duty of Care to Protect Lawful Visitors.

The District Court acknowledged that, like landowners, occupiers and lessees of land also owe a nondelegable duty of reasonable care to all lawful visitors. (J.A. 2574); s*ee Nelson*, 349 N.C. at 631, 507 S.E.2d at

892. An occupier and lessee's duty "requires that [they] not unnecessarily expose a lawful visitor to danger and give warning of hidden hazards of which [they have] express or implied knowledge." *Shepard v. Catawba Coll.*, 270 N.C. App. 53, 64, 838 S.E.2d 478, 486 (2020). This duty requires any occupier and lessee "to make a reasonable inspection to ascertain the existence of hidden dangers" for the benefit of any contractors and employees on the leased land. *McCorkle*, 208 N.C. App. at 714, 703 S.E.2d at 752. The duty to inspect is concomitant with the occupier's duty to keep the property "reasonably safe and to warn of hidden perils or unsafe conditions that could be discovered by reasonable inspection and supervision." *Nelson*, 348 N.C. at 618, 507 S.E.2d at 884; *see also Martishius v. Carolco Studios, Inc.*, 142 N.C. App. 216, 223, 542 S.E.2d 303, 308 (2001), aff'd, 355 N.C. 465, 562 S.E.2d 887 (2002). When Daw Farms leased the field in 2016, it had a continuing duty to inspect it for hazards.

Daw Farms cannot escape its duties to Mr. Kritter by hiring an intermediary. Where "a principal has a nondelegable duty, one with whom the principal contracts to perform that duty is as a matter of law an agent for the purposes of applying the doctrine of *respondeat superior*."

20

*Medley v. N. Carolina Dep't of Correction,* 330 N.C. 837, 845, 412 S.E.2d 654, 659 (1992) (emphasis in original). Accordingly, a defendant with a non-delegable duty, such as an occupier and lessee of land, "cannot, by employing a contractor [in this case, Jordan Elmore], get rid of their own duty to other people, whatever the duty may be." *Id.* at 841, 412 S.E.2d at 657. Daw Farms may have delegated authority to Elmore for the spraying operation because he "[knew] what was best" and directed him to handle all communications with Kritter, but it cannot avoid its non-delegable duties. (J.A. 985-987).

Further, an apparent agency relationship is created when "a person, by words or conduct, permits itself to be represented that another is his agent." *Diggs v. Novant Health, Inc.*, 177 N.C. App. 290, 301, 628 S.E.2d 851, 858 (2006). Such a relationship estops the principal from denying the agency of the third person they permitted to represent them if the apparent relationship was relied upon by the plaintiff. *See id.; Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 166 (4th Cir. 1988). Gene Kritter reasonably believed that Elmore was acting as Daw Farms' agent. It was Elmore who invited Mr. Kritter onto Daw Farms' land and provided him with instructions about where to spray. Elmore was

21

Plaintiffs' only local contact; since Gene Kritter never communicated with any representative of Daw Farms, he looked to Elmore for direction. (J.A. 909, J.A. 983-986, J.A. 1267).

### b.   Daw Farms Was Required to Protect Lawful Visitors from the Hidden Danger on The Land They Farmed.

Daw Farms' duty to Gene Kritter, included removing the cable, which could have been easily accomplished, especially when it fell into disuse. (J.A. 2376). At a minimum, Daw Farms was required to warn Kritter of the cable's existence and location.  If they elected to use an intermediary, they were required to direct their agent, in this case Elmore, to warn Kritter about the danger. *See Medley*, 330 N.C. at 845, 412 S.E.2d at 659.

Since Elmore acted within the course and scope of his agency and apparent agency for Daw Farms at all relevant times, Daw Farms is responsible for his negligence.

### c.   The District Court Erred by Finding that the Danger a Steel Cable Presented to a Cropdusting Aircraft was Unforeseeable to Daw Farms as a Matter of Law.

The danger presented by the cable was as reasonably foreseeable to Daw Farms as it was to Murry Daw, if not more so. In the four years leading up to Gene Kritter's death, Daw Farms was the entity most

22

familiar with the land. (J.A. 2387). Evidence about the foreseeable dangers presented to cropduster pilots by the cable includes the following:

- Daw Farms actively farmed over 3,000 leased acres including the corn fields Mr. Kritter was hired to spray. (J.A. 968, J.A. 2387).

- Daw Farms and its officers frequently hired professional pilots to conduct aerial cropdusting chemical applications. (J.A. 884-886, J.A. 975-976).

- Delanor Daw had seen a cropduster fly so low over a field of crops that it "had beans on [its] wheels." (J.A. 900).

- Daw Farms used a helicopter cropduster to spray its fields in 2019. (J.A. 886).

- Both the President and Vice President of Daw Farms observed parts of the 2019 cropdusting operation. (J.A. 900, J.A. 982).

- Delanor Daw stated that the helicopter in the 2019 spraying operation "looked mighty close" to the top of the corn it was spraying. (J.A. 900).

- At the time of Gene Kritter's spraying operation in June 2020, Delanor Daw knew that cropdusters "fly pretty low" when spraying crops. (J.A. 900-901).

- Daw Farms knew on June 18, 2020, that a cropduster would be coming to spray the corn that was growing in their corn fields, including Murry Daw's 18 acres. (J.A. 907).

- Because the President and Vice-President of Daw Farms were farming Murry Daw's field, which was bordered by Delanor Daw's field, they had seen the cable and knew about its presence in June 2020. (J.A. 418-421, J.A. 1687-1688, J.A. 2533).

- Daw Farms' Vice President, Paul Daw, had known about the existence and location of the steel cable for "a long time before June 2020." (J.A. 1023).

- Daw Farms' President knew a "suspicious" and "unusual" cable was suspended over the field leased from Delanor Daw's brother, Murry. (J.A. 925-926).

- Daw Farms knew that Gene Kritter would fly just a few feet above the top of its corn, where the cable extended over the field. (J.A. 900-901).

24

From these facts, a jury can reasonably infer that Daw Farms was familiar with cropdusting, knew that a cropduster would be spraying their fields, knew of the existence of the cable across Murry Daws' field, and knew that Gene Kritter would be flying his helicopter at an altitude that coincided with the cable's height. From these inferences, a reasonable jury could find that Daw Farms was aware, or should have been aware, that the cable posed a reasonably foreseeable danger to Kritter.

In *Martishius v. Carolco Studios, Inc.*, a jury found the owner of a film set in Wilmington, North Carolina, liable for injuries sustained by a contractor operating a JLG Boom Lift on the set when he collided with power lines running the movie set. 142 N.C. App. at 218–22, 542 S.E.2d at 305–07. The power lines were difficult for the contractor to see while operating the lift because trees often obscured the lines and the contractor was looking into the sun. *See id.* at 219–21, 542 S.E.2d at 306-07. The studio knew that the lines were there, knew that the workers were constructing a set near the lines, and had numerous options to keep the workers safe from the powerlines. *See id.* at 221–22, 542 S.E.2d at 306-07. However, the studio "took no precautions to remedy the

dangerous conditions on its premises. Accordingly, this evidence is substantial evidence [that the studio] failed to take precautions against an unreasonable risk of serious harm." *Id.* at 224, 542 S.E.2d. at 308. Both the Court of Appeals and the North Carolina Supreme Court affirmed the jury verdict. 355 N.C. at 467, 562 S.E.2d at 889; 142 N.C. App. at 226, 542 S.E.2d at 309.

Like the studio in *Martishius*, the officers of Daw Farms were aware of the cable hanging across Murry's Field. They knew that Elmore had hired a cropduster who would fly at a low altitude over Murry's field and would likely encounter the cable, which, like the movie studio's power lines, was virtually impossible to see. Like the power lines in *Martishius*, the cable posed an unreasonable risk of serious harm, even more so since it served no purpose and had been unused for many years. The cable could have easily been removed, which would have entirely eliminated the danger. (J.A. 2376). Daw Farms not only failed to remove the dangerous cable but did not take any steps to warn Kritter, either directly or through Elmore. (J.A. 1064, J.A. 1196, J.A. 1267).

IV.    **The District Court's Determination that Murry Daw and Daw Farms Did Not Have Notice of the Hazard Presented by the Cable Ignores the Applicable Law and Facts.**

Summarizing cases from several jurisdictions, the District Court stated "that whether construction or maintenance of an inconspicuous wire amounts to negligence often turns (at least in part) on the extent to which the constructor either has notice the wire has previously posed a risk to aircraft or does not have such notice." (J.A. 2579). This summary suggests that notice of the risk of a wire to an aircraft only exists when the landowner is aware of a previous wire strike. The cases cited do not support this proposition and this is not the law.

Rather, the cases only hold that there is no duty to protect or warn when a defendant has no reason to expect aircraft to be remotely near the wires they constructed and "could not reasonably contemplate an aircraft would have been flying at the altitude of the crash in that location." *Baine v. Oklahoma v. Gas & Elec. Co*., 1992 OK CIV APP 140, 140, 850 P.2d 346, 349 (Ok. Ct. App. 1992); *see also Poelstra v. Basin Elec. Power Co-op*., 1996 S.D. 36, 545 N.W.2d 823 (S.D. S. Ct. 1996) ("[defendant] could not reasonably anticipate that air patrols would be conducted in [] an area [containing an inconspicuous wire]" when that

27

area had been marked as inappropriate for air patrols); *Florida Power and Light Co. v. Lively*, 10 Fla. L. Weekly 589, 589, 465 So. 2d 1271, 1274-5 (Fla. Dist. Ct. App. 1985) (defendants had no duty to warn of wire when they had no reason to believe a plane undergoing a mechanical issue would descend below minimum regulatory altitude, outside of a permissible flight zone, during an emergency landing); *Gunn v. Edison Sault Elec. Co.*, 24 Mich. App. 43, 44-47, 179 N.W.2d 680, 682-83 (Mich. Ct. App. 1970) (defendant had no duty to protect descending seaplane from a power line when pilot attempted to land on an unofficial approach and no evidence was presented that anyone had ever attempted to land an aircraft in the manner in which the decedent pilot attempted); *Walker v. Texas Elec. Service*, 499 S.W.2d 20 (Tex. Civ. App. 1973) (defendant had no duty to protect landing pilot against powerlines when pilot had no authorization to be flying where powerlines were erected).

In stark contrast, the Daw Defendants, and their agent Elmore, knew that aerial applicators would regularly fly in close proximity to the cable extended across the field and actually invited Kritter to spray chemicals by helicopter onto Murry Daw's field. (J.A. 85, J.A. 885-887,

J.A. 900-901, J.A. 907, J.A. 925-926, J.A. 975-976, J.A. 982, J.A. 1023, J.A. 1661-1664, J.A. 1681-1682, J.A. 1674-1677, J.A. 2387-2387).

The duties of Murry Daw and Daw Farms are not dependent upon direct knowledge of previous wire strikes over their land but exist because they had reason to know that a cropduster would likely operate in close proximity to the cable and be placed in some form of danger by it. *See Foster v. Winston-Salem Joint Venture,* 303 N.C. 636, 642, 281 S.E.2d 36, 40 (1981) ("It is axiomatic that to establish the element of foreseeability, the plaintiff need not prove that the defendant foresaw the injury in the exact form it occurred. The plaintiff need only show that in the exercise of reasonable care the defendant should have foreseen some injury would result from his act or omission or that the consequences of a generally injurious nature might have been expected."); *see also Bogle v. Duke Power Co.,* 27 N.C. App. 318, 321-22, 219 S.E.2d 308, 309-11 (1975) (defendant had duty to exercise reasonable care for constructing and maintaining powerlines when those lines are likely to come in contact with the public); *Hobby Shop, Inc. v. Drudy*, 161 Ind. App. 699 (1974) (knowledge of previous accidents with an imperceptible wire is "not determinative as a matter of law" on issue of foreseeability); *Shute*

*v. Moon Lake Elec. Ass'n, Inc.,* 899 F.2d 999 (10th Cir. 1990) (defendant electric company had duty to warn helicopter pilots against danger of unmarked powerlines as long as some air traffic was likely to encounter the powerlines).

In allowing summary judgment, the District Court overlooked substantial evidence in favor of the Plaintiffs, including inferences reasonably drawn from that evidence. *See Emmons v. City of Chesapeake*, 982 F.3d 245, 250 (4th Cir. 2020). Both Murry Daw and Daw Farms were well aware of the "suspicious" and "unusual" cable suspended over a field of crops where a cropduster would be flying - a danger reasonably foreseeable to any layperson, let alone commercial farmers with years of experience with cropdusters. (J.A. 85, J.A. 885-887, J.A. 900-901, J.A. 907, J.A. 925-926, J.A. 975-976, J.A. 982, J.A. 1023, J.A. 1661-1664, J.A. 1681-1682, J.A. 1674-1677, J.A. 2387-2387).

Here, a reasonable jury can make the same determination: this cable strung over this field, constitutes a foreseeable and unreasonable risk of harm. *See Branzel v. City of Concord*, 247 Cal. App.2d 68, 74-5, 55 Cal. Rptr. 167, 167 (1966) (finding that a reasonable juror could find that the danger presented by a model plane crashing into power line was

foreseeable when landowner knew model planes flew in their vicinity); *Inferrera v. Town of Sudbury*, 31 Mass. App. Ct. 96, 97-103, 575 N.E.2d 82, 83-6 (1991) (determining a danger presented to a traveling snowmobile by a metal chain was reasonably foreseeable when defendants knew vehicles traveled on the land containing the chain was question for jury); *Towe v. Sacagawea, Inc.*, 357 Or. 74, 105-6, 347 P.3d 766, 785-86 (Or. 2011) (holding that the foreseeability of the danger presented by a cable stretched across land traveled by motorcyclists was a question inappropriate for the court to decide as a matter of law).

## V. By Inviting Gene Kritter Onto Land to Conduct Cropdusting Operations, Elmore Owed Plaintiffs an Independent Duty to Exercise Reasonable Care.

### a. Elmore Undertook an Active Course of Conduct Which Required Him to Exercise Reasonable Care.

Every person owes a duty to "exercise that degree of care for the safety of others that a reasonable prudent person would exercise under the same circumstances." *Bogle*, 27 N.C. App. at 321, 219 S.E.2d at 310. This duty arises under "the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to endanger the person or property of others." *Pinnix v. Toomey*, 242 N.C. 358, 362,

87 S.E.2d 893, 897–98 (1955); *see also Davidson & Jones, Inc. v. New Hanover Cnty.*, 41 N.C. App. 661, 666, 255 S.E.2d 580, 584 (1979) ("The law imposes upon every person who enters an active course of conduct the positive duty to exercise ordinary care to protect others from harm."). This duty extends to all "causes of injury that [are] reasonably foreseeable and avoidable through the exercise of due care." *Fussell v. North Carolina Farm Bureau Mut. Ins. Co., Inc.*, 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010); *see also Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006); *Palsgraf v. Long Island R.R. Co.,* 238 N.Y. 339, 344, 162 N.E. 99, 100 (1928). "Whether the injury [or harm] was foreseeable depends on the particular facts." *Stein*, 360 N.C. at 328, 626 S.E.2d, at 268. Accordingly, "[u]sually the question of foreseeability is one for the jury." *Slaughter v. Slaughter*, 264 N.C. 732, 735, 142 S.E.2d 683, 686 (1985) (citations omitted).

As he had done for the better part of a decade, Elmore organized a chemical spraying operation for June 18, 2020. (J.A. 1131-1132, J.A. 1178-1179). Accordingly, he had a duty to organize the spray operation safely. *See Quail Hollow East Condo Ass'n v. Donald J. Scholz Co.,* 47 N.C. App. 518, 522, 268 S.E.2d 12, 15 (1980) ("[U]nder certain

circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person, for injuries resulting from his failure to exercise reasonable care in such undertaking.").

The duty to protect third parties from harm arises where the defendant is in a position that "anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to the person or property of the other." *Davidson & Jones*, 41 N.C. App. at 666, 255 S.E.2d at 584. This duty to third parties includes those third parties who have been contracted to work with or on behalf of a defendant. *See Quail Hollow*, 47 N.C. App. at 522, 268 S.E.2d at 15-16; *Estate of Long v. Fowler*, 378 N.C. 138, 861 S.E.2d 686 (2021). Accordingly, Elmore owed a duty to provide reasonable protections and warnings to Gene Kritter about reasonably foreseeable dangers.

The danger presented by the cable was reasonably foreseeable to Elmore, who had previously seen and was aware of the wire. (J.A. 1141-1142). Elmore, who also had a duty to inquire of Daw Farms whether

33

there were hazards about which he should advise, knew that Kritter's flight would fly close to that same cable on June 18th, 2020. (J.A. 1209-1210). He had spent "most of his life" around cropdusters and had observed both fixed-wing and helicopter cropdusting operations through these experiences. (J.A. 1161). He even observed Gene spray his own field that very day, necessarily watching the speeds and altitude that Gene's helicopter flew. (J.A. 1209-1210; J.A. 2339).

### b. Gene Kritter Had a Right to Rely on the Reasonable Assurances Given to Him by Jordan Elmore.

Plaintiffs' highly experienced aerial applicator pilot, Rod Thomas, testified that Kritter's reliance on Elmore to warn him about hidden hazards was reasonable and consistent with industry standards. Gene's "lengthy, preflight briefing with Jordan Elmore" was the action of a reasonable and experienced agricultural aviation pilot concerned with identifying hazards. (J.A. 2375). Such conversations are typical and consistent with the responsibilities of crop consultants and chemical salesmen like Elmore. (J.A. 2966-2067). Elmore had a responsibility, consistent with industry standards, to be aware of and warn against any and all aerial application hazards. (J.A. 2063-2064, J.A. 2066-2067). It was appropriate for Gene Kritter to look to Elmore for this information.

34

Accordingly, when Elmore failed to warn about the cable, it was reasonable for him to rely upon this silence. *See Jones v. Douglas Aircraft Co.*, 251 N.C. 832, 836, 112 S.E.2d 257, 260 (1960) (determining crane operator had right to rely on assurances that power lines would be de-energized); *Overton v. Farmers Mfg. Co.*, 196 N.C. 670, 146 S.E. 706, 707 (1929) (holding employer liable for injuries of employee wherein employer assured employee that boiler was safe); *McConnell v. Pic-Walsh Freight Co.*, 432 S.W.2d 292, 296 (Mo. 1968) ("A person may rely on assurances, or representations of safety made to him by others, where, under the same or similar circumstances, an ordinarily prudent man would do so.").

### c. The District Court Erred by Finding Jordan Elmore Had No Duty of Care to Protect Mr. Kritter from a Danger That He Knew Existed.

The Vice-President and Manager of Daw Farms, Paul Daw, testified that he believes Nutrien holds some responsibility for the crash because they arranged the cropdusting service. (J.A. 1098). This testimony emphasizes that Daw Farms expected Elmore to take responsibility for all aspects of the operation – which would include safety warnings required of Daw Farms.

35

Warning Kritter of the hidden and reasonably foreseeable danger presented by the cable did not exceed the scope of Elmore's "calling" as a matter of law.  In support of this position, the District Court relied upon three cases. (J.A. 2589). Two of these cases, *Davidson & Jones v. New Hanover Cnty.*, 41 N.C. App. 661, 255 S.E.2d 580 (1979) and *Firemen's Mut. Ins. Co. v. High Point Sprinkler Co.*, 266 N.C. 134, 146 S.E.2d 53 (1966), support the opposite position. In these two cases, North Carolina's appellate courts found that an architect and sprinkler system converter, respectively, were duty-bound to exercise the reasonable skill and care of those in their professions when performing their jobs to prevent foreseeable and avoidable dangers. This is equally true for Elmore who organized the spray operation and informed Gene Kritter of the details necessary to conduct it.

Reliance on *Lambeth v. Media Gen., Inc.*  for the proposition that imposing a duty of reasonable care upon Elmore would exceed the scope of his "calling" is misplaced. 167 N.C. App. 350, 605 S.E.2d 165 (2004). In *Lambeth,* the North Carolina Court of Appeals found that protecting a customer homeowner from criminal activity exceeded the duty of care imposed upon a newspaper company. The court in *Lambeth* found the

defendant newspaper company had no duty to protect its customers from third-party criminal activity which the company had no reason to believe was reasonably foreseeable. *See id.* at 352-53. *Lambeth* is plainly distinguishable from the facts of the instant case. Here, because Elmore knew that Gene would operate his aircraft at the same location and altitude where a narrow steel cable overhung a field, the danger posed to the operator of the aircraft was reasonably foreseeable. (J.A. 1209-1210). By assuming responsibility for coordinating the spraying operation, it became Elmore's responsibility to provide critical safety information to Kritter.

The District Court agreed that North Carolina law recognizes a theory of premises liability based on a duty of care owed by a general contractor, such as Elmore, to his subcontractor, such as Gene Kritter. (J.A. 2588); *see Langley v. R.J. Reynolds Tobacco Co.*, 92 N.C. App. 327, 329, 374 S.E.2d 443, 445 (1988) ("It is also well-settled that the employee of a subcontractor working for a general contractor is a[] [lawful visitor] in relation to the general contractor."); *see also Wellmon v. Hickory Const. Co.*, 88 N.C. App. 76, 80, 362 S.E.2d 591, 593 (1987); *Cowan v. Laughridge Const. Co.*, 57 N.C. App. 321, 324, 291 S.E.2d 287, 289 (1982).

37

This duty extends to all dangers "which the subcontractor or his employees could not have reasonably discovered and of which the owner or general contractor knew or should have known." *Pike v. D.A. Fiore Const. Services, Inc.*, 201 N.C. App. 406, 409, 689 S.E.2d 535, 538 (2009) (internal citation omitted).

Similarly, Elmore owed a duty of care to Kritter to warn of those dangers he knew or should have known about, that Kritter could not reasonably discover. *See Langley*, 92 N.C. App. at 329, 374 S.E.2d at 445.

**VI.  Nutrien and Daw Farms Are Responsible for Elmore's Breach of His Duty of Reasonable Care to Protect Gene Kritter Because He was Acting in the Course and Scope of His Employment Relationship with Nutrien and in the Course and Scope of His Agency Relationship with Daw Farms.**

**a.  Elmore was Acting Within the Course and Scope of His Employment with Nutrien.**

Nutrien admitted in its Answer that Elmore was acting in the course and scope of his employment with Nutrien when he organized and supervised the June 18, 2020 spraying operation. (J.A. 61). It is well-established that an employer is responsible for the negligence of his employee's negligent conduct committed within the course of his employment or within the scope of his authority. *See Waller v. Hipp*, 208

N.C. 117, 179 S.E.2d 428 (1935). An employee is acting in the course of his employment when he is engaged in an activity that he is "authorized to undertake and which is calculated to further, directly or indirectly, the employer's business." *Perry v. Am. Bakeries Co.*, 262 N.C. 272, 274, 136 S.E.2d 643, 645 (1964) (citing *Hildenbrand v. McDowell Furniture Co.*, 212 N.C. 100, 193 S.E.2d 294 (1937).

### b.    Elmore was Acting Within the Course and Scope of His Agency with Daw Farms.

Daw Farms had a nondelegable duty of care to lawful visitors on their occupied and leased land and is vicariously liable for the negligence of its agent who, with their authorization, invited a lawful visitor onto their leased land. Therefore, Defendant Daw Farms is not only independently negligent but also vicariously liable for the failure of its agent, Jordan Elmore, to use reasonable care.

### VII.    The District Court Erred by Denying Plaintiffs' Motion for Partial Summary Judgment.

Pursuant to controlling North Carolina premises liability law, the landowner and lessee Defendants and their agents had separate duties to protect Kritter, a lawful visitor, from the hidden danger on the land on which they invited him. *See Roumillat,* 331 N.C. at 64, 414 S.E.2d at 342-

343, abrogated on other grounds by *Nelson*, 349 N.C. at 631, 507 S.E.2d at 892. This duty could have been addressed by any of the following: removing the steel cable, visibly marking the steel cable, or warning Gene Kritter of the cable's existence. Despite the simplicity of each of these solutions, there is no dispute that each of the Defendants did absolutely nothing to comply with any of their duties. By failing to inspect the field and remove, mark, or warn of the presence of the cable, each of the Defendants breached their duty of reasonable care to Mr. Kritter.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the District Court's order granting Appellees' motions for summary judgment and denying Appellants' motion for partial summary judgment.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request that this Court hear oral argument in this appeal. Oral argument is warranted because the Plaintiffs' appeal is meritorious and involves issues controlled by North Carolian premises liability law that have not been recently decided by this Court or applied to agricultural aircraft operators. Plaintiffs have made every effort to

fully develop every issue in their Opening Brief but believe the Court will

benefit from oral argument.

    This the 15th day of May, 2024.

                Respectfully submitted,

                /s/ John A. Chilson
                W. Thompson Comerford, Jr.
                John A. Chilson
                COMERFORD CHILSON
                & MOSER LLP
                1076 West 4th Street
                Winston-Salem, NC 27101
                Telephone: (336) 631-8510
                Facsimile: (336) 631-8228
                comerfordt@ccm-law.com
                chilsonj@ccm-law.com

41

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __24-1158__      Caption: __Kritter v. Mooring et al.__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____8,087_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
Century Schoolbook in 14 point font ___ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) John A. Chilson _____

Party Name Lynne Kritter; Kritter Cropdusting ___

Dated: May 15, 2024 _____